611 So.2d 906 (1992)
Charles Ralph DAVIS
v.
STATE of Mississippi.
No. 90-KA-0560.
Supreme Court of Mississippi.
December 17, 1992.
Rehearing Denied February 18, 1993.
*907 Michael Adelman, Adelman & Steiner, Hattiesburg, for appellant.
Michael C. Moore, Atty. Gen., John R. Henry, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and PITTMAN and ROBERTS, JJ.
HAWKINS, Presiding Justice, for the Court:
Charles Ralph Davis appeals his conviction in the circuit court of Marion County of the crimes of being an accessory before the fact to burglary and accessory before the fact to rape of his wife by another man. Finding no error, we affirm.

FACTS
Davis and his wife, Toni Sue Davis, in July, 1989, lived in a house trailer in a rural *908 area of Marion County.[1] Davis was employed as a crane operator for B & S Welding out of Grand Isle, Louisiana, and Mrs. Davis was employed as a sales clerk by Wal-Mart in Columbia. There were two children from the marriage: Wendy Ann, eight; and Dustin, three or four years old.
On the morning of July 18, Davis went to see his wife at Wal-Mart and adjusted the clutch on her automobile. After he repaired her car, she thought he left for his job in Louisiana. However, around 9:30 that night, Davis came to their trailer and asked her for some money. An argument ensued, he became angry and upset and appeared to have been drinking. He left approximately ten minutes later, she thinking he was on his way to work.
Some time around 2:00 or 2:30 a.m. on Wednesday morning, July 19, 1989, Mrs. Davis awakened to find a strange man in the bedroom. Wendy Ann Davis, who had been upset by her parents' argument earlier that evening, was asleep with her mother in her parents' bed during this time. Mrs. Davis became alarmed when she realized that the man was neither her husband nor her son. She noticed that the man was black and wearing light colored clothing. In explicit words, he told Mrs. Davis that he wanted to have sex with her, and threatened to kill her. After the man threatened both her and her children, he then attempted to force Mrs. Davis to perform oral sex upon him. When she refused, he fondled her and raped her. During this time, Mrs. Davis did not scream or yell because of the fear that it would awaken Wendy Ann.
After raping her the man asked her where she kept her money and jewelry, and proceeded to rummage through the bedroom, bathroom, and closets. The man found two shotguns (which were normally kept loaded) in the bedroom closet and set them outside the closet door. Mrs. Davis then told him that she kept money in her purse, which was in the kitchen. He then went into the kitchen, got her purse, and told her to place a pillowcase around her head so that her eyes would be covered.
Mrs. Davis was then told to lie on her stomach. She again felt someone upon her. Someone got on top of her and tried to have anal intercourse with her. Her struggling aborted this attempt. She was then turned partially over and a foreign object of some type was forced into her vagina. This act was repeated three to four times. Mrs. Davis was unable to control her screams of pain. She was also able to glance across the bed from under her blindfold and see the black man holding Wendy Ann's mouth shut. During this assault Mrs. Davis bit her assailant's arm. The assailant in turn held a pillow over her face until she stopped struggling. Mrs. Davis was not able to see her assailant at any point during the second attack, nor did she know when the second man entered into and left the bedroom, only that there were two men. After it was over, she heard two vehicles crank up. One of them sounded like her husband's Bronco because of the "high pitched whine" it made.
Mrs. Davis gathered her children, placed a pillowcase between her legs due to her heavy bleeding, placed one of the shotguns, which had been left on the porch, in the car and drove to the home of her sister-in-law, Deborah Carpenter, some five to seven miles' distance. The children got out of the car and banged on the door.
Sometime around 3:00 a.m. on July 19, Deborah Carpenter, Davis' sister, awoke to the sound of a car horn, pounding on the door, and voices screaming, "Aunt Debbie, open the door." She opened the door and saw Wendy Ann and Dustin. She asked the children what was wrong and Wendy Ann cried, "Help my mama. Help my mama ... those people hurt my mama bad." Carpenter asked her who the people were, and Wendy Ann replied, "[t]hat black man and my daddy." Deborah Carpenter then dressed and got in the car with Mrs. Davis in order to accompany her to the hospital. The children remained at the house with Carpenter's boyfriend. Carpenter recalled that there was a great deal of blood on Mrs. Davis and in the car. Carpenter also testified that Mrs. Davis was *909 hysterical at this point but continued to drive.
Upon her arrival at the Marion County Hospital sometime after 3:00 a.m., Dr. Jerry Fortenberry initially treated Mrs. Davis' injuries, and then called Dr. Marie LaGarde. Dr. LaGarde arrived at the hospital around 5:00 a.m. that same morning in order to assist in treating Mrs. Davis who had suffered a massive vaginal hemorrhage.
Dr. Marie LaGarde determined that the injuries necessitated immediate surgical repair.
Dr. LaGarde found from the massive bleeding that Mrs. Davis' blood pressure was unstable and she required two liters of fluid and blood. In performing surgery, Dr. LaGarde found small bruising in the perineal area outside the vagina, and a small laceration under the ureter where the urine evacuated. Dr. LaGarde also found "numerous tears around the rectum." When the dressing which had been used to stop vaginal bleeding was removed, Dr. LaGarde found a "large tear through the vaginal wall into the pelvic side wall. That includes all the muscles of the vagina and in through the pelvic side wall, and this was actively bleeding." Dr. LaGarde also found two other lacerations. The lacerations "were not short. There were  appeared to be a stellate type fracture, a blunt object of some sort." Dr. LaGarde excluded both a fist and a penis as having caused the injuries, the first because to have caused this injury in such a manner would have required great force and caused great bruising outside the vagina. She did not believe a fist could have been inserted in the vagina. Dr. LaGarde eliminated a penis because it could not have caused such an injury to the vagina.
A fist could not have done it. A penis could not have done it. A knife would not have done it. This was not a sharp, clean cut. It was a laceration. It would have had to have been an object small enough to enter a woman's vagina and it would have to have had some sort of blunt end. A bottle of some type  I've seen these types of lacerations with coke bottles because they're ideally suited. They have a neck, and you can grab them, and you can shove them and get enough force to cause this type of laceration, something like that, or a flashlight which might have a  a narrow neck handle which you could grab and get enough force, something like that.
Sheriff Webbie McKenzie and Mason Sistrunk, Criminal Investigator for the D.A.'s office, were called to the hospital around 4:00 a.m. on the morning of July 19. After speaking with Mrs. Davis and Deborah Carpenter, Sistrunk and Officer Colon Williamson went to the Davis trailer. They found Mrs. Davis' abandoned purse, made photographs of the bedroom, and gathered certain evidence, including the sheets and pillowcases on the bed.
Charles Ralph Davis was arrested in Grande Isle, Jefferson Parish, Louisiana, and was returned to the Sheriff's Department in Marion County, Mississippi.
On August 3, 1989, sometime after 3:00 p.m., Davis, in custody of the Sheriff at that time, was questioned by Investigator Sistrunk and Sheriff McKenzie. During the questioning period, both an oral and a written statement were obtained from Davis. Sistrunk testified that he began by reading Davis the Miranda warning. Initially, Davis denied having any connection with the crimes committed. After further questioning, and once McKenzie revealed to Davis that he had checked with Davis' employer and discovered that he had not been at work in Louisiana on July 18-19, 1989, Davis gave his side of what happened. According to the officers' testimony, Davis was cooperative throughout the remainder of the interrogation and he did not request to see his family or an attorney.
In his statement, Davis said that on the night of July 18-19, he left his home, bought approximately $80.00 worth of cocaine and "gave myself a shot of cocaine."[2] Somewhere along the bypass near Columbia, Davis picked up a black *910 man who was hitchhiking. The two men drove around Marion County for a couple of hours and then they went to the Davis trailer. Davis also stated that he and Brown discussed Brown going inside to get some money but they did not discuss Brown raping Mrs. Davis. Davis gave Brown his key and waited approximately thirty minutes before Brown returned with a metal box. Davis then stated that he "shot up several more times" and they drove to Louisiana where Davis dropped Brown off and went on to work. The statement was read over by Davis and he signed it in the presence of Officer Sistrunk while the Sheriff was outside room. Finally, the officers questioned Davis about a mark on his upper arm. Davis replied that it was caused by an injury offshore while he was at work.
Mason Sistrunk set up an appointment for Charles Davis to see Dr. Michael West, a forensic dentist in Hattiesburg, Mississippi.
The grand jury of Marion County on September 28, 1989, indicted Davis and one Lawrence Brown under a four count indictment. Count One charged Brown with burglary of the house trailer with intent to commit a sexual battery, rape and aggravated assault upon Mrs. Davis, and Davis with being an accessory to this burglary in assisting, encouraging and abetting Brown's entry into the trailer. Count Two charged Brown with raping Mrs. Davis and Davis with being an accessory to that crime as well by aiding, abetting and assisting Brown in its accomplishment. Count Three charged Davis with sexual battery in violation of Miss. Code Ann. § 97-3-95 by penetrating the vaginal opening of Mrs. Davis with an unknown object, thereby causing serious bodily injury. Count Four charged Brown with committing an aggravated assault upon Wendy Ann Davis with a deadly weapon, namely, a shotgun, for the purpose of preventing the child from coming to the aid of her mother while Davis was committing a sexual battery upon her mother, in violation of Miss. Code Ann. § 97-3-7(2)(b).
Pretrial motions to suppress the statement given by Davis to the law enforcement officers and to quash Count One of the indictment were overruled. The basis of the motion to suppress was that the statement had not been given freely and voluntarily, and to quash the indictment was that Davis, as co-owner of the trailer, had a right to consent to Brown's entry, and therefore, entry could not have been burglarious.
At the trial of Davis in April, 1990, Deborah Carpenter was a witness for the State. When the State offered into evidence through her the statements made by Wendy Ann at her residence on July 19, the defense objected and the circuit judge conducted a competency hearing outside the presence of the jury. The court permitted the testimony after finding that the statements were "part of what was going on in the on-going incident, while they were getting her to the hospital, and so I'm going to let it in."
Dr. Morris West, a forensic odontologist, testified that he had examined Mrs. Davis and taken impressions of her teeth, and also made photographic enlargements of the models. He also examined the wound on Davis' left arm on August 8, 1989, and took photographs, including ultra violet photographs, of the arm. He concluded the wound was a bite mark consistent with having been inflicted approximately three weeks previously. He described in detail the type and function of each tooth, the kind of marks it would make, and testified that he had no doubt the wound inflicted on Davis was a bite mark from Mrs. Davis.
When the State rested, the defense offered into evidence a video-taped deposition of Dr. Richard Souviron, a forensic odontologist from Miami, Florida. He testified that the wound on Davis' arm was not a bite mark, but even if it were, it was inconsistent with Mrs. Davis' teeth.
Following trial the jury found Davis not guilty on Count Three, the sexual battery charge under Miss. Code Ann. § 97-3-95, and guilty on Counts One and Two, the accessory to burglary and to rape. The circuit court sentenced Davis to ten years *911 imprisonment under the burglary count and thirty years under the accessory to rape count, the sentences to run consecutively. Davis has appealed.

LAW
We first find that Davis' challenge to the sufficiency of the evidence to make a jury issue on his guilt without merit and requires no discussion. He was clearly an accessory to Brown's criminal conduct.

I. FAILURE TO DISMISS COUNT ONE
Davis first claims that the court erred in failing to dismiss Count One of the indictment because he, Davis, as a co-owner of the trailer, had the right to consent to Brown's entry into the trailer, and therefore there was no "breaking and entering." Miss. Code Ann. § 97-17-21 (Supp. 1989), states in pertinent part:
§ 97-17-21. Burglary  inhabited dwelling.
Every person who shall be convicted of breaking and entering, in the day or night, the dwelling house of another, in which there shall be, at the time, some human being, with intent to commit some crime therein, either by forcibly bursting or breaking the wall, or an outer door, window or shutter, of a window of such house, or the lock or bolt of such door, or the fastening of such window or shutter, or by breaking in in any other manner ... shall be guilty of burglary, and imprisoned in the penitentiary not less than seven years nor more than fifteen years.
Davis does not challenge the sufficiency of the evidence as to a physical "breaking and entering," and we have consistently held that any act of force, however slight, necessary to be used in entering a building is sufficient to constitute a "breaking." Mason v. State, 344 So.2d 144 (Miss. 1977); Branning v. State, 222 So.2d 667 (Miss. 1969); Newburn v. State, 205 So.2d 260 (Miss. 1967): Fondren v. State, 253 Miss. 241, 175 So.2d 628 (1965); Gross v. State, 191 Miss. 383, 2 So.2d 818 (1941).
Davis' challenge is that since he as a co-owner could enter the building, he could also consent to Brown's entering the building, and therefore Brown's entry was not burglarious. Davis is, of course, correct that ordinarily a person who enters a building with the consent of the owner has not made an unlawful entry, and consequently there was no criminal "breaking and entering." Mason v. State; Holderfield v. State, 215 Miss. 564, 61 So.2d 385, 386 (1952); 12 C.J.S. Burglary § 24.
The question in this case, however, is whether Davis, even though he was co-owner of the trailer, had the right to consent to Brown's entry for the purpose of raping or robbing Mrs. Davis.
To justify a conviction of burglary, it is necessary not only to show that a person entered a building of another person, but in addition that at the time he did so, he intended to commit a crime therein. The intent to commit a crime therein must co-exist with the physical act of entry. Brumfield v. State, 206 Miss. 506, 40 So.2d 268 (1949); Gross v. State, 191 Miss. 383, 2 So.2d 818 (1941). Brown clearly fulfilled these conditions.
Does the fact that he entered the trailer at co-owner Davis' request, however, change it from having been burglarious? We conclude that Davis' participation in the entry was no defense to the burglary count.
The crimes in this case which Brown intended to commit upon entering the trailer were not against Davis, but Mrs. Davis. While Davis was co-owner, Mrs. Davis was then in actual possession, sleeping peacefully. In Clinton v. State, 163 Miss. 435, 439, 142 So. 17, 18 (1932), we recognized that it was the person against whom the crime was directed who was important when we held that "insofar as the burglary is concerned, the occupant of the property at the time is the owner... ." Again, in Taylor v. State, 214 Miss. 263, 266, 58 So.2d 664, 665 (1952), wherein the burglarious intent was to steal property of the tenant, we held that "the occupant of the building at the time of the burglary is the owner," and that allegations of the indictment of "ownership of the title to the building constitute surplusage ..." While *912 Davis had the authority to consent to Brown's entry into the trailer for a lawful purpose, by no stretch of reasoning could he ever be considered as having a right to authorize Brown's entry to rob or rape Mrs. Davis.
In People v. Talbot, 64 Cal.2d 691, 700, 51 Cal. Rptr. 417, 428, 414 P.2d 633, 639 (1966), cert. denied 385 U.S. 1015, 87 S.Ct. 729, 17 L.Ed.2d 551 (1967), the California Supreme Court held that the crime of burglary was an "integral" offense consisting of an entry together with an evil intent, which was indivisible into ingredients, and that consent could not be made to relate to entry alone as a constituent ingredient. It was therefore no defense to the indictment for burglary that the owner-possessor of a building consented to another's entry into the building to murder a guest.
In State v. Gregor, 11 Wash. App. 95, 521 P.2d 960, 962 (1974), the Washington Court of Appeals held that permission by one of the co-owners and co-possessors of a residence to the entry by the accused for the purpose of stealing from the other owners constituted no defense to a burglary charge, holding "the statutory offense of second degree burglary of the dwelling house of another involves no unlawfulness of entry except as the entry becomes unlawful by reason of the criminal intent of the person entering."
Courts from other jurisdictions have also held that permission by an agent or custodian of the owner to an accused to enter a building to steal constitutes no defense, because the agent or custodian clearly had no authority to give such permission. State v. Gendusa, 193 La. 59, 190 So. 332, 338 (1939); People v. Harris, 33 Ill. App.3d 600, 338 N.E.2d 129 (1975); People v. Castile, 34 Ill. App.3d 220, 339 N.E.2d 366 (1975); Damico v. State, 153 Fla. 850, 16 So.2d 43 (1943). In K.P.M. v. State, 446 So.2d 723 (Fla.App. 2 Dist. 1984), a minor son permitted the accused to enter the residence of his parents to steal, and the Florida Court of Appeals held this constituted no defense to the crime of burglary because clearly the son had no authority to grant such permission.
It would be monstrous to hold that Davis had any authority whatever to permit Brown to enter the trailer for the purpose of robbing or raping his wife, and having no such authority, his consent did not prevent Brown's entry from having been burglarious.

II. FAILURE TO DISMISS COUNT THREE
Davis argues that he was immune from prosecution for sexual battery upon Mrs. Davis, and the court's erroneous failure to dismiss Count Three unduly prejudiced him on the remaining counts.
Count Three charged Davis with sexual battery under Miss. Code Ann. § 97-3-95 (Supp. 1991), which reads in pertinent part:
A person is guilty of sexual battery if he or she engages in sexual penetration with:
(a) Another person without his or her consent ...
Davis argues on appeal that he could not be prosecuted for a sexual battery on his wife because of Miss. Code Ann. § 97-3-99 (Supp. 1991), which states:
A person is not guilty of any offense under sections 97-3-95 through 97-3-103 if the alleged victim is that person's legal spouse and at the time of the alleged offense such person and the alleged victim are not separated and living apart.
Davis is, of course, correct that if he had himself solely perpetrated this atrocity, then under Miss. Code Ann. § 97-3-99 he was immune from prosecution. This overlooks, however, Miss. Code Ann. § 97-1-3 (Supp. 1972), which states:
Every person who shall be an accessory to any felony, before the fact, shall be deemed and considered a principal, and shall be indicted and punished as such; and this whether the principal have been previously convicted or not.
The fact that Davis may have been immune from prosecution had he solely on his own committed the battery does not also give him immunity if it was committed by someone else and he had aided and abetted its commission. Compare Wages v. State, 210 *913 Miss. 187 at 190, 49 So.2d 246 at 247 (1950) (where evidence demonstrated that defendant was at least an accessory, he could be liable as principal). See also Rozell v. State, 502 S.W.2d 16 (Tex. Crim. App. 1973); People v. Damen, 28 Ill.2d 464, 193 N.E.2d 25 (1963); Cody v. State, 361 P.2d 307 (Okla. Crim. 1961); State v. Digman, 121 W. Va. 499, 5 S.E.2d 113 (1939); Kitchen v. State, 101 Tex.Crim. 439, 276 S.W. 252 (1925). See also Annotation, Criminal Responsibility of Husband for Rape, or Assault to Commit Rape, on Wife, 24 A.L.R.4th 105 (1983).
Under the rule that all persons present, aiding and abetting in the commission of a felony, may be convicted as principals, a husband may be guilty of the crime of rape upon his wife where it appears that the act of intercourse with the wife was accomplished by a man other than the husband, and that the husband perceived it to be done or assisted the other in its execution.
65 Am.Jur.2d §§ 27, 29 pp. 775-777.
By Instruction S-3-B, the circuit court properly instructed the jury that if Brown himself committed the sexual battery upon Mrs. Davis, and Davis aided and assisted Brown in its commission, then the jury should return a verdict of guilty. This instruction concluded, however, with the following sentence:
However if you should find from the evidence in this case that Charles Ralph Davis alone committed the act of sexual battery then you must find him not guilty as an accessory to sexual battery.
The jury returned a verdict of not guilty.
Moreover, even if it were error to submit the guilt or innocence of Davis of the charge of sexual battery to the jury, it was cured by the jury's verdict. Hudson v. State, 199 Miss. 406, 408, 24 So.2d 779, 780 (1946); Davis v. State, 151 Miss. 883, 119 So. 805, 806 (1929). Russell v. William, 168 Miss. 181, 190, 150 So. 528, 530 (1933); Dicus v. Republic Paint & Varnish Works, 128 Miss. 189, 192, 90 So. 729, 730 (1922).
Testimony and evidence pertaining to Mrs. Davis' having been sexually assaulted by some foreign object following Brown's having raped her was competent as part of a continuing offense that night aside from Count Three. "Proof of another crime is permissible where the offense charged and that offered to be proved are so interrelated as to constitute a single transaction or occurrence or a closely related series of transactions." Ladner v. State, 584 So.2d 743, 758 (Miss. 1991). See also Wheeler v. State, 536 So.2d 1347, 1352 (Miss. 1988); McFee v. State, 511 So.2d 130, 136 (Miss. 1987); Neal v. State, 451 So.2d 743, 759 (Miss. 1984). The State has a "legitimate interest in telling a rational and coherent story of what happened." Mackbee v. State, 575 So.2d 16, 28 (Miss. 1990); Brown v. State, 483 So.2d 328, 330 (Miss. 1986).
The evidence pertaining to the sexual battery upon Mrs. Davis being competent and relevant as part of a continuing occurrence that fateful night, even if Davis had been immune from prosecution under Count Three, the error in submitting the issue of his guilt or innocence thereunder was harmless in view of the jury's verdict.

III. HEARSAY TESTIMONY OF DEBORAH CARPENTER
Davis argues that the testimony of Deborah Carpenter, which in part repeated statements made by Wendy Ann Davis, constitute inadmissible hearsay.
Rule 803(2) of the Mississippi Rules of Evidence (MRE) states:
RULE 803. HEARSAY EXCEPTIONS; AVAILABILITY OF DECLARANT IMMATERIAL.
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
(2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under stress of excitement caused by the event or condition.
The comment to Rule 803(2) states:
(2) Excited Utterance
The underlying theory of the excited utterance exception is that circumstances *914 may create such an excited condition that the capacity for reflection is temporarily impeded and that statements uttered in that condition are thus free of conscious fabrication. As in the present sense impression exception, the essential ingredient here is spontaneity. With respect to the time element, the issue is the duration of the excited state. This, depending on the exact circumstances of a case, can vary greatly. The declarant need not be a participant but only an observer of the event which triggered the excitement.
Our Mississippi Rules of Evidence come from the Federal Rules of Evidence (FRE), and federal courts hold that the admission or exclusion of testimony under Rule 803(2) is discretionary with the trial court. Kenosha Auto Transport Corp. v. Lowe Seed Co., 362 F.2d 765 (C.A.Ill. 1966). We likewise find that the competency of excited utterances is a matter largely discretionary with our trial courts and we find no abuse of discretion in admitting the testimony of Deborah Carpenter. See generally Evans v. State, 547 So.2d 38, 41 (Miss. 1989) (neighbor testified to what victim said immediately following her attack); Harris v. State, 394 So.2d 96, 98 (Miss. 1981) (spontaneous statement by victim determined to be competent, thus it was admissible); Gill v. State, 485 So.2d 1047, 1050 (Miss. 1986) (neighbor testified regarding spontaneous declaration made by victim). Wendy Ann's statements to her aunt were related to a "startling event" while she was "under the stress of the excitement caused by the event." Indeed, her statements give a classic example of when such statements are admissible under MRE 803(2).

IV. TESTIMONY OF DR. LaGARDE
During her trial testimony, Dr. LaGarde testified that Mrs. Davis had told her that her husband had committed the sexual assault. This was immediately objected to and the court sustained the objection and instructed the jury to disregard the question and answer. Out of the presence of the jury, Dr. LaGarde then testified that, in getting a history of what had happened, Mrs. Davis related that it was Wendy Ann who told her it was her daddy who did it. The State then asked the court to permit the jury to hear that Mrs. Davis told Dr. LaGarde that Wendy Ann had told her that Davis was the one who assaulted her. When the jury returned, Dr. LaGarde was asked if, during her examination of Mrs. Davis she "of her own personal knowledge, did she tell you anything about her husband having done this  of her own personal knowledge?" She answered, "No."
On appeal Davis argues that he was entitled to a mistrial because of Dr. LaGarde's testimony that Mrs. Davis told her Davis had committed the assault. If there was any error in the admission of this testimony, it was cured by the court's sustaining the objection and instructing the jury to disregard it, Roundtree v. State, 568 So.2d 1173, 1178 (Miss. 1990), and also by the fact that once the jury had returned to the box, it was told that Mrs. Davis of her own personal knowledge did not know who committed the assault.
Dr. LaGarde did not testify before the jury that Mrs. Davis had related to her that it was Wendy Ann who informed her en route to Carpenter's home that Davis committed the offense, but if she had done so, it would have been harmless error because Deborah Carpenter had already testified that Wendy Ann made the same statement to her.
Finding no error, we affirm.
AFFIRMED.
ROY NOBLE LEE, C.J., and PRATHER, SULLIVAN, PITTMAN, BANKS, McRAE and ROBERTS, JJ., concur.
DAN M. LEE, P.J., concurs in result only.
PITTMAN, J., concurs with separate written opinion joined by HAWKINS, P.J., and BANKS and ROBERTS, JJ.
PITTMAN, Justice, concurring:
I concur with the result reached in this case, but write to notice a grave omission in the law. Section 97-3-99 Miss. Code Ann. (Supp. 1992) reads as follows:

*915 A person is not guilty of any offense under sections 97-3-95 through 97-3-103 if the alleged victim is that person's legal spouse and at the time of the alleged offense such person and the alleged victim are not separated and living apart.
Sections 97-3-95 through 97-3-103 address the offense of sexual battery. "A person is guilty of sexual battery if he or she engages in sexual penetration with ... [a]nother person without his or her consent." Miss. Code Ann. § 97-3-95 (Supp. 1992).
In the case sub judice prosecution was not able to charge Charles Davis with sexual battery because of his marital status. The evidence showed it was Davis who forcibly tried to have anal intercourse with his wife, and also Davis who repeatedly forced a foreign object into Mrs. Davis' vagina, causing massive vaginal hemorrhaging. These actions clearly fit the definitions of sexual battery under Miss. Code Ann. § 97-3-97 (Supp. 1992), but the statute declared Charles Davis "not guilty" under section 97-3-95 through 97-3-103.
While this statute, drawn to exclude married persons, may be intended to preserve the sanctity of marriage, it also finds guiltless spouses who sexually assault their partners. It describes victims for whom there is no protection from sexual battery like that afforded others under the same statutes. The spouse of a non-consenting and sexually abused victim is given protection for acts clearly prohibited if performed on a non-spouse.
In the case sub judice, the prosecution successfully obtained a conviction against Davis as being an accessory before the fact to burglary and rape of his wife by another man. However, if no other man had been involved and Davis alone committed the sexual assault, his wife and the State would have limited recourse against him. If the described activities are to be memorialized as criminal activities against one person or an entire class of people we should not by statute make the offensive activity "legal" as to a differing class.
In the case sub judice the defendant argued section 97-3-99 as an unqualified, complete shield from prosecution for sexual battery. We note that the district attorney's position was strongly contrary to this argument by the defendant and that the district attorney suggested judicial qualifications of the statute. The legislature should reconsider the language of section 97-3-99.
HAWKINS, P.J., and BANKS and ROBERTS, JJ., join this opinion.
NOTES
[1] They divorced in September of 1989.
[2] From the record, it is unclear whether Davis inhaled or injected the cocaine.